(Supreme Court, Special Term, Montgomery County.   September, 1914.)

1. PATENTS (§§ 103, 117*)—TIME FOR ISSUANCE—PAYMENT OF FEE.
     The patent fee must be paid within six months after notice of allowance of the patent, and the patent must issue within three months after payment of the fee or the application is forfeited.

     [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 143, 169; Dec. Dig. §§ 103, 117.*]

2. LIMITATION OF ACTIONS (§ 67*)—EXECUTION OF ASSIGNMENTS OF PATENTS—ACTIONS TO REQUIRE.
     Actions to require the execution of assignments of patents issued in 1900, pursuant to a sale contract, executed in 1893, of "inventions made in the future," were not barred by the statute of limitations, where no claim was made, until 1913, that the plaintiff corporation did not own the patents, and defendants and their predecessor, the patentee, had enjoyed as stockholders a share of the earnings from the patents.

     [Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. §§ 376–378; Dec. Dig. § 67.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

3. PATENTS (§ 202*)—CONTRACT OF SALE—CONSTRUCTION.

A resolution, passed in 1893 by the directors of a corporation purchasing patents from an inventor present at the meeting, and evidencing a sale to the corporation "of all patents that have been granted him * * * and for all applications pending, inventions now made, or made in the future," covered patents issued to the inventor in 1900, notwithstanding the use of the word "for," where it appeared that both contracting parties realized that the success of the proposed business of the corporation depended on keeping up with the times by making and patenting future inventions.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 281–289; Dec. Dig. § 202.*]

4. PATENTS (§ 16*)—"INVENTION."

An "invention" is not a patent, and is not an application for a patent. It is a conception, an idea; it is a newly discovered thing, something that had not been known before.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 14, 15; Dec. Dig. § 16.*

For other definitions, see Words and Phrases, First and Second Series, Invention.]

Action by the Klauder-Weldon Dyeing Machine Company against Katharine Weldon and another, executors, etc., to require the execution of assignments of two patents. Decision for plaintiff.

R. W. France, of New York City, and Chas. S. Nisbet, of Amsterdam, for plaintiff.

Christopher J. Heffernan, of Amsterdam, for defendants.

VAN KIRK, J. These actions are brought to require the execution of assignments of two patents, in order to complete the record title in plaintiff.

In 1890 the Weldon Company was doing business in Amsterdam, N. Y., and the Klauder Company in Pennsylvania. The two interests united, and the Klauder-Weldon Machine Company was incorporated in Pennsylvania, one-half of the stock of the new corporation going to the stockholders in the Weldon Company and one-half to the stockholders in the Klauder Company. The basis of the stock holdings of Leonard A. Weldon was his ownership of his patents. Weldon was one of the large holders. In 1910 the plaintiff, a New York corporation, was organized by those in the Pennsylvania company for the purpose of taking over the assets and property of the Pennsylvania company. The said New York corporation is the plaintiff here. The defendants in the first action are the executors of Leonard A. Weldon. The defendant in the second action claims to be the owner of one of the patents in issue here by assignment from the executors of Leonard A. Weldon.

At the organization of the Pennsylvania company in 1890 Leonard Weldon, who was an inventor and had had long experience in the manufacture of machinery, was chosen the business manager and vice president, which positions he occupied until his death in February, 1901. On January 3, 1893, at a regular meeting of the directors of said company, the salary of the general manager was fixed at $5,000 per annum and 30 per cent. of all net profits made in America over and

above $25,000.   In the minutes of the annual meeting of stockholders on the same day is the following resolution:

"Mr. J. H. Giles moved that the company purchase from Mr. Leonard Weldon for the sum of $3,000, all patents that have been granted him in this and other countries since the organization of the company and for all applications pending, inventions now made, or made in the future, and the treasurer be directed to pay him this sum on the completion of assignment papers.   Unanimously adopted, 1,740 shares voting."

This resolution was offered by the defendant John H. Giles, who was then a director of the corporation.   Leonard A. Weldon was present at both of said meetings.   The $3,000 mentioned in the latter resolution was paid by the company's note February 2, 1893, which note was on April 22d paid by check of the company.   On February 21, 1893, Leonard A. Weldon executed to the company an assignment of five applications for patents, which applications were dated, respectively November 21, 1892, November 28, 1892, January 23, 1893 (two), and February 10, 1893.   In each case a patent was later issued upon these applications and became the property of the company.   He also assigned at some later date to the company an application, dated March 21, 1893, upon which a patent issued November 20, 1894.

There were issued to Leonard Weldon patents dated December 25, 1894, August 18, 1896, March 20, 1900, and October 16, 1900, which have never been assigned to the company; the last two being the patents in question in this suit.   Each patent above mentioned was intended to be used in connection with the machines manufactured by the company.   In each case the invention was made and tested in the shops where the plaintiff's machines were being constructed, from materials belonging to the company and by its employés.   The inventions were made by Leonard A. Weldon while in the employ of the company, upon the company's time, and in each case, when the invention was perfected, the improvement was embodied in the company's machinery and sold in the market.

The more valuable invention in question in this action, an improvement for adjusting parts of the rack in the dyeing machine (the patent number of which is 659,906), was made in 1897; the first machine embodying this invention was sold in January, 1898.   Letters patent upon this invention were taken out in England, and the dyeing machines made by the company in England embodied this invention.   Constantly from 1898 to the present day, the company has made its dyeing machines with this improvement on each.   Since 1902 or 1903, the patent plate on these machines contained those two patents set forth in the usual form.   When the New York company was organized, the Pennsylvania company executed an assignment of these two patents in the usual form to the New York company, and said assignment was duly recorded in the patent office.   The drawing furnished by Mr. Weldon, from which to make patterns of this patent, when presented to the pattern maker, had on it the name, "Klauder-Weldon Dyeing Machine Company."   During the three years from January, 1898, to February, 1901, Leonard A. Weldon made no claims for royalty or any other demand for the use by the company of this

patent. No question as to the ownership of this patent arose in the lifetime of Leonard A. Weldon.

[1] Mrs. Weldon testifies that she paid the patent fee after the death of Mr. Weldon; also that the patents were given to her by Mark Dewey. Again she says:

"I sent a draftsman up there to explain everything to Mark Dewey, and it was through this draftsman that the patent was granted to me and the bill was sent to me."

But the patent fee must be paid within six months after notice of the allowance of the patent, and the patent must issue within three months after the fee is paid (30 Cyc. 892); a patent is not issued until the fee is paid. These patents were issued before Mr. Weldon's death. Mrs. Weldon is evidently mistaken in her testimony in this respect. It does not appear in the evidence by whom the fee was paid; it does appear that Mr. Weldon was, from time to time, paid by the company his expenses and disbursements. Mrs. Weldon testified, in connection with the payment of the fee, that she knew the patent was very valuable and had not been assigned. But no question ever arose between her and the plaintiff as to the assignment of this patent until 1913. She testifies that she did not know that the plaintiff was using this patent; but, knowing that it was very valuable, and knowing that it had not been assigned, if she thought the patent belonged to her as executrix of Mr. Weldon, it is strange that she never made any claim upon the company. And it is to me quite inconceivable that she knew the patent was valuable, that it was not assigned to the company, but was the property of Mr. Weldon, and yet should never try to use it for profit during 12 of its 17 years of life. During all the time until 1913 she has been a stockholder of the company, receiving her share of the dividends.

A letter was put in evidence dated February 25, 1901, addressed to the company, and written by Mark Dewey, the patent attorney, which letter informed the company that the patents in question had not been assigned. This letter was produced by Mrs. Weldon, who also is in possession of the letters patent. She says the letter came to her from Mr. Smith, who had been employed as bookkeeper in the company's office and shortly after Mr. Weldon's death was removed from his position. The evidence is not at all satisfactory that this letter ever came to the knowledge of the company; nor is it satisfactorily shown how the letters patent came into the possession of Mrs. Weldon. She testifies in one place that she received them from Mark Dewey after Mr. Weldon's death (if this is true Mr. Weldon never had them in possession); and in another place that she found them among his papers. It would be significant if they were brought to her, with the letter, by Mr. Smith, after Mr. Weldon's death. If they were in possession of Mr. Weldon at the time of his death, he was then the general business manager, having full direction of the company, as well as its vice president.

Mr. Giles, a witness for the defendants, had been constantly connected with the company since 1893, and, since in or about 1897, was the business manager and vice president. Mr. Giles testifies that, at the

stockholders' meeting, January 3, 1893, Mr. Weldon stated, before the resolution was passed, that he had some inventions, some for which he already had made applications, some others, on which applications were being prepared, were in his patent attorney's office, and one was in a "nebulous" condition in his mind. Mr. Giles was the business manager and vice president of the company at the time the assignments were made in 1910 by the Pennsylvania company to the New York company. He knew of that assignment, and that it contained these two patents. He testifies to a conversation with Mr. Klauder, the president of the company, in 1901, in which the letter of February 25th was mentioned, and the fact that these two patents had never been assigned was also mentioned; and in which Klauder said, "We better let sleeping dogs lie." If this conversation occurred, it is not inconsistent with the belief upon the part of Mr. Klauder that the company owned the two patents under the resolution of January 3, 1893, although the record title did not show such ownership; he may well have thought that, the company claiming to own under the resolution, it was as well not to raise the question after Mr. Weldon's death. But, in connection with this testimony of Giles, he gave other testimony. In 1908 he wrote letters showing that he did not then know whether or not these patents had been assigned—one to the patent attorney. In 1911 he wrote to Duell that the patents' plates contained the numbers of these two patents. There was no other transaction by which the company became the owner of these patents except the resolution of January, 1893, and the payment to Mr. Weldon of the $3,000. Mr. Giles is a large stockholder of the plaintiff. In 1913 he was succeeded by another as general manager of the company, since which event the disputes here in issue have arisen. If he knew in 1893 that the parties to the transaction then made intended it to cover only the applications for patents outstanding and the one invention which Weldon had unsolved in mind, then, during the correspondence above mentioned, and when the transfer was made to the New York company in 1910, and while he was a stockholder and in the employ of the company, he must have been willing that Mrs. Weldon should be deprived of her property rights. I believe that Mr. Giles is confused in his recollection, and that the meaning of the resolution of January, 1893, must be determined without the aid of his testimony.

In December, 1901, the salary due Mr. Weldon was adjusted between the executors of Mr. Weldon and the plaintiff. At this time she testifies she had in her possession the aforesaid letter of February 25, 1901, and the letters patent, and knew that this patent was valuable. She executed then a release in full of all claims against the company. This release was signed by her coexecutor, Samuel H. Telford, who is her father, and who had been in the employ of the company in its manufacturing department, where some parts of this patented article had been made, up to the time of Mr. Weldon's death. There is no satisfactory proof that the company, or its officers, other than Leonard A. Weldon, knew these patents had not been assigned until 1908.

[2-4] Two defenses are urged, one the statute of limitations, and another that the contract did not include these patents. The statute of limitations is no defense. If, in the sale, January 3, 1893, these patents

were included, then, upon the issuing of the patent, they were the property of the plaintiff, and a written assignment was only necessary to perfect the record title, so that the one question presented is whether or not the resolution of January 3, 1893, covered the two patents. Under the resolution Weldon sold to the Dyeing Machine Company all his patents, applications for patents, inventions now made or made in the future. An invention is not a patent, and it is not an application for a patent. It is a conception, an idea; it is a newly discovered thing, something that had not been known before. In 1893 "inventions made in the future" were intangible and unknown things, of which there could be no assignment in specific form. It could not be that the resolution covered only patents and applications for patents, for it specifically says that it conveys also "inventions now made or made in the future." These words must be given a meaning. The correct meaning of the resolution is had by striking out the word "for" before the words, "all applications pending." The use of this word indicates that the drafter of the resolution had lost the line of thought with which he started. The wording is broad. The resolution was evidently not prepared by an attorney or by one accustomed to use exact phraseology. Considering the words that were used, the relative circumstances of the parties, and the acts of the parties thereafter, I am unable to accept the position taken by the able counsel for the defendant. He urges that the meaning is disclosed by inserting certain words so that the resolution would read, "all applications pending, inventions now made or made in the future on pending applications." An application cannot be made for an undiscovered invention or an invention made in the future. The application is for a patent and must describe the invention. Were it not for the last clause in the resolution, its meaning would be clear. Weldon was working for the company and was being paid for the time he was using in making his inventions, testing them, and putting them out, and was a large stockholder in the company. He was receiving a salary of $5,000 a year. It would not be a strange or unusual contract to provide that inventions that he should produce during the course of his employment with this company should belong to the company. The last clause of the resolution, however, provides that the $3,000 be paid on "the completion of assignment papers." No single assignment paper was ever executed as a compliance with this resolution. The assignments that Weldon did make were separate assignments. The defendants' attorney urges that the parties intended that the $3,000 should not be paid until those things then purchased by the company had been assigned; he says that the consideration would not be paid by a sane busines man until he had received that which he had purchased. There would be nothing unbusinesslike in the transaction if a man sold to his employer the inventions he might make while in his employ for $3,000, payable when the agreement was made. The fact is that the consideration in this case was paid before any assignment was made. The payment was made on the 2d day of February; the assignments were made on the succeeding 21st day of February. There is nothing unfair or unjust in holding, as I do, that the parties understood by this transaction that Weldon sold and the company purchased for $3,000 all inventions that he might make while in their employ in

connection with machines they manufactured for sale. If they did so intend, at some time the consideration must be paid. It is not at all necessary to conclude that, if the parties had such intention, then the consideration would not be paid until Mr. Weldon's death, or until the termination of his employment. Mr. Weldon did, at the time the resolution was passed, have outstanding certain applications for patents, either formulated and filed or about to be. I think the last clause of the resolution should be given no more significance than that it was intended to pay the $3,000 to Mr. Weldon, and that the drafter of the resolution fixed the time of payment upon the completion of assignment papers, and the assignment papers then had in mind were those for applications of patents then filed or about to be.

A patent is issued for 17 years. In 1913, 13 years of this period had expired. Up to that time there had been no claim whatever that the plaintiff did not own these patents. The defendants and Mr. Leonard Weldon in his lifetime enjoyed as stockholders a share in the earnings from these patents. The patent which I have principally considered is essential to the success of the business in one of its principal machines. When this resolution was passed, it was realized by Mr. Weldon and the other members of the company that the success of their business depended upon keeping up with the times, making machines that could be sold, and, if possible constantly bettering them. It seems to me that it would now be unjust for the court to hold that the parties did not intend that the company, in which Mr. Weldon was a large stockholder, should own and enjoy the benefit of those inventions which Mr. Weldon made while he was being paid his salary, using the time which belonged to the company, using the employés of the company and their time, using the materials of the company, using its shops and its machines for testing the inventions, and teaching the trade their value.

I have examined all the authorities that have been cited by the parties. My conclusion is that the plaintiff is the owner of the two said patents and is entitled to a written assignment of each.

Ordered accordingly.